# UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA
## (ALEXANDRIA DIVISION)

| | | |
|---|---|---|
| DWIGHT A. GREEN | : | |
| 1 Wilk Court | : | |
| Lawrenceville, New Jersey 08648 | : | |
| | : | |
|       Plaintiff, | : | |
| v. | : | |
| | : | Civil Action No. _____ |
| ADVERTISING ANALYTICS, LLC | : | |
| d/b/a ADIMPACT, | : | |
| 1427 Leslie Avenue | : | |
| Alexandria, Virginia 22308 | : | |
| | : | |
|       Defendant. | : | |

## COMPLAINT

Comes Now the Plaintiff, Dwight A. Green, ("Plaintiff" or "Mr. Green"), by and through his undersigned counsel and brings these claims for damages against the Defendant, Advertising Analytics, LLC d/b/a AdImpact ("Defendant" or "AdImpact"). In support thereof, Plaintiff states as follows:

## INTRODUCTION

In May 2022, Plaintiff was employed as Defendant's Chief Business Officer, having accepted that position more than a year earlier while he was providing contractually agreed upon consulting services to Defendant. Defendant induced Plaintiff to accept this new role in exchange for agreed upon wages, promised commissions, and profit sharing interests in the Defendant Company. After more than a year's service in this new role as Chief Business

1

Officer, Plaintiff's employment was summarily terminated without cause. In accordance with his Employment Agreement, Plaintiff was owed two months of his base salary and benefits, which Defendant readily offered to Plaintiff. However, to date, Defendant has refused to honor additional payments owed to Plaintiff under the Employment Agreement. As such, Defendant is in breach of contract, has breached the implicit covenant of good faith and fair dealing, and is in knowing violation of the Virginia Wage Payment Act. Plaintiff brings this lawsuit to recover damages and receive compensation for Defendant's wrongful conduct.

## JURISDICTION AND VENUE

1.      This Court has subject matter jurisdiction over this action based on diversity of citizenship pursuant to 28 U.S.C.A. § 1332.

2.      Plaintiff Dwight Green, an individual, resides and at all times relevant hereto resided, at 1 Wilk Court, Lawrenceville, Mercer County, New Jersey 08648.

3.      Mr. Green is a citizen of the State of New Jersey for purposes of diversity jurisdiction.

4.      Defendant AdImpact is and at all times relevant hereto was a Virginia limited liability company, maintaining its principal place of business at 1427 Leslie Avenue, Alexandria, Virginia 22308.

5.      AdImpact is a citizen of the State of Virginia for purposes of diversity jurisdiction.

6.      The amount in controversy exceeds Seventy-Five Thousand Dollars ($75,000.00), the minimum threshold for jurisdiction pursuant to 28 U.S.C.A. § 1332.

7.      AdImpact and Mr. Green executed an employment agreement with an effective date of April 20, 2021 (the "Employment Agreement").

8.      A copy of this Employment Agreement is attached hereto as Exhibit 1 and is incorporated herein as if set forth in full.

9.      Section 17 of the Employment Agreement requires Mr. Green's consent to jurisdiction and venue, and specifically provides that any dispute arising out of the Employment Agreement be brought in a State or Federal Court located in Alexandria, Virginia, under the laws of the Commonwealth of Virginia.

10.     Venue is proper pursuant to 28 U.S.C.A. § 1391(b)(1), as AdImpact resides in this judicial district.

## FACTS COMMON TO ALL COUNTS

11.     Plaintiff incorporates by reference all preceding paragraphs in this Complaint as if fully set forth herein.

12.     Plaintiff holds an electrical engineering and computer science degree from Princeton University and an MBA degree with a specialty in entrepreneurial management and finance from The Wharton School.

13.     Professionally, Plaintiff is an industry-recognized cross-functional executive leader with a highly specialized expertise across the data, media, and marketing technology markets, particularly focusing on guiding business unit, venture, and product solution buildouts.

14.     In 2007, Mr. Green founded the consulting company known as VentureStrat Associates LLC, a New Jersey limited liability company ("VentureStrat").

15.     Mr. Green is, and at all times relevant to this cause of action has been, the sole Managing Partner of VentureStrat.

16.     Through VentureStrat engagements, Mr. Green has provided business enterprise clients with highly specialized strategic planning, product/solution buildout, and go-to-market execution services that have become well-regarded by numerous executive leaders in the data, media, and marketing technology market space based on Mr. Green's proven record of high-value outcomes for clients over more than a decade.

17.     As part of such professional engagements, Mr. Green provides his clients with his specialized expertise, his extensive knowledge of the relevant dynamic and complex U.S. market ecosystem, and his highly valuable professional connections with numerous executives developed over more than two decades.

18.     At all times relevant to this lawsuit, VentureStrat served as Mr. Green's sole livelihood and his primary source of income.

19.     Effective November 20, 2020, AdImpact entered into a consulting services agreement with VentureStrat, which was executed by Kyle Roberts ("Mr. Roberts") as Chief Executive Officer ("CEO") of AdImpact and Mr. Green as the sole Managing Partner of VentureStrat (the "Consulting Agreement") (attached hereto as Exhibit 2).

20.     The Consulting Agreement, which was for a term of one year, limited VentureStrat to performing an average of two (2) to two-and-one-half (2.5) days of work per week, and provided for three components of compensation, including Company Profits Interest. (Exhibit 2).

21.     The Company Profits Interest component of VentureStrat's compensation was for eight-tenths of one percent (0.8%) of AdImpact's then-outstanding fully-diluted capitalization, and was to be awarded on the five (5) month anniversary of the Effective Date of the Consulting Agreement, on the condition of forgiveness of the Small Business Administration ("SBA") Paycheck Protection Program ("PPP") Loan of AdImpact's indirect parent, and that it vest over seven (7) months following the date of grant with a threshold value equal to the fair market value of such interest as of the date of the grant, as reasonably determined by AdImpact's board of directors. The full vesting date coincided with the expiration of the Consulting Agreement. (Exhibit 2).

22.     In accordance with the Consulting Agreement, Mr. Green provided non-exclusive consulting services on behalf of VentureStrat to AdImpact, while also providing similar consulting services to other VentureStrat clients for five months, until April 20, 2021.

**AdImpact Hires Plaintiff as Chief Business Officer**

23.     On April 20, 2021, the same date upon which the Company Profits Interest under the Consulting Agreement were to be awarded, AdImpact hired Mr. Green as a full-time employee under the terms and conditions provided in the attached Employment Agreement. (Exhibit 1).

24.     The Employment Agreement, which replaced and superseded the terms of the Consulting Agreement, provided that Mr. Green would serve "in a full-time capacity as Chief Business Officer, reporting to the Company's Chief Executive Officer," Mr. Roberts. (Exhibit 1, ¶2).

25.     Instead of being limited to working 2-2.5 days per week, the Employment Agreement provided that Mr. Green would serve on a "75% full-time basis" and that "the Company expects that Executive will devote approximately 30 hours of his time per standard 40 hour workweek in the performance of his duties for the Company, but he may be required to devote more or less time on any particular week depending on the needs of the Business." (Exhibit 1, ¶3.b.).

26.     Following Mr. Green's hiring as Chief Business Officer, AdImpact issued press releases touting his appointment:

- Green brings over 20 years of experience building out ventures and solutions at the intersection of martech, data, media, and advertising. He has driven business innovation and monetization outcomes in audience targeting, attribution, identity resolution, ad intelligence, and other solutions for Nielsen, WPP, Deluxe Corporation, and others. Green began his career as a software engineer, and since then has founded and operated profitable ventures and advised executive leaders at major to emerging companies.

- Green has executed impactful outcomes in diverse leadership roles including strategy, product, business development, and general management. Prior to joining AdImpact, Green was a General manager and SVP at Deluxe Corporation, where he rafted and executed the strategic plan to monetize the firm's audience data, analytic insights, and other strategic digital media assets. Previously, he was the General Manager and Vice President of Digital Products & Strategy at Neilsen, where he successfully pioneered the development of Nielsen's audience targeting solution leveraging premium data sets such as PRIZM segmentation, TV viewership, and CPG purchase insights.

- "Dwight has a proven track record of success where martech meets advertising and data. His perspective from exposure to hundreds of business models is invaluable. He is helping to build the future of ad intelligence at AdImpact," said Kyle Roberts, Chief Executive Officer. "He has a keen ability to leverage both traditional and digital approaches in enhancing business value. This is vital today as AdImpact builds solutions to fill gaps formed by our dynamic market environment. We look forward to having him on board."

- Michael Schader, AdImpact's founding CTO who built its technology platform from the ground up said "Dwight's encyclopedic knowledge of the media industry, combined with his engineering sensibility and business acumen, make him the perfect executive to take AdImpact to the next level – and beyond!"

*See* (https://finance.yahoo.com/news/adimpact-taps-nielsen-deluxe-veteran-120000747.html) *and* (https://www.globenewswire.com/en/news-release/2021/06/03/2241255/0/en/AdImpact-Taps-Nielsen-and-Deluxe-Veteran-Dwight-Green-as-Chief-Business-Officer.html).

**Employment Agreement**

27.     Section 1 of Plaintiff Green's Employment Agreement for the Chief Business Officer role provides in part:

> Start Date and Employment. Executive's employment with the Company under the terms of this Agreement shall commence on the Effective Date. The Parties acknowledge that this Agreement shall govern Executive's employment with the Company from and after the Effective Date. The Company and Executive hereby acknowledge that Executive's employment by the Company shall be at-will (as defined under applicable law), and either Company or Executive may end the employment relationship at any time, with or without Cause (as defined below [in Section 7.d. of the Employment Agreement]), and with or without advance notice, at the option of either the Company or Executive. If Executive's employment terminates for any reason, Executive shall not be entitled to any payments, benefits, damages, awards or compensation, other than as specifically provided in Section 7 of this Agreement. (Emphasis added.)

(Exhibit 1, ¶1).

28.     The base salary offered by AdImpact in the Employment Agreement (One Hundred Eighty-Six Thousand Dollars ($186,000)) was well below market in comparison to Mr. Green's consulting fees and the opportunity to continue Mr. Green's consulting business. Thus, the parties understood that the other compensation offered by AdImpact, such as, the Profits Interest and Commissions, would combine to make up this difference. AdImpact was fully aware that the compensation, particularly the Profits Interest in AdImpact, was an essential and key part of the offer in Mr. Green's acceptance of the Employment Agreement.

29.     Section 4 of the Employment Agreement provides the terms of Mr. Green's compensation, as separated into different groups, including: (a) Base Salary; (b) Commission; and (c) Profits Interest. (Exhibit 1, ¶4).

30.     Exhibit A to the Employment Agreement describes the written commission plan, which provides, in part:

> **Commissions.** Executive shall be eligible to earn commission payments equal to ten percent (10%) of Gross Sales the Company receives during the prior calendar year relating to new Qualifying Contracts and eight percent (8%) of Gross Sales the Company receives during the prior calendar year relating to renewed Qualifying Contracts. Eligibility for payments of such commissions shall cease at the end of the twelfth (12th) calendar month following the termination of this Agreement, regardless of any future revenue received on any Qualified Contract.
> . . .
>
> Earned commissions are due to the Executive within fifteen (15) calendar days after the end of each calendar month in which the Company receives payment in full on an applicable Qualifying Contract. The Company also shall send Executive a "Commission Statement' associated with Gross

Sales receipts that shall include the customers' names, invoice amounts/dates, and receipts amounts/dates. Earned commissions due to Executive shall only survive termination of this Agreement to the extent set forth in this Exhibit A.

(Exhibit 1, Ex. A).

31.    "Gross Sales," "Qualifying Contract," and "Referred Customer" are specifically defined in Exhibit A. The definition of "Referred Customer" explains, in part, that "[n]o commissions will be deemed earned on any Qualifying Contract on which the Company has not received any payment as of the date of termination of Executive's termination <u>for Cause</u>, as such term is defined in Section 7(d) of the Agreement." (Emphasis added).  (Exhibit 1, Ex. A).

32.    Plainly, in the Employment Agreement, AdImpact contemplated, acknowledged and agreed to payment of Commissions to Plaintiff Green following his termination without Cause.

33.    In the Employment Agreement, "Cause" means: "(i) the conviction (meaning, for purposes of this Agreement, an actual conviction, a guilty plea, or a plea of no contest) for a felony or other crime involving moral turpitude or the commission of any crime involving misappropriation, embezzlement or fraud with respect to the Company or any of its subsidiaries or affiliates or any of their respective customers or suppliers; (ii) conduct causing the Company or any of its subsidiaries or affiliates public disgrace or disrepute; (iii) failure to perform duties as reasonably directed by the CEO, which failure, if capable or being cured, is not cured within thirty (30) days after delivery of written notice from the Company or Executive describing specifically the nature of such failures and the

action required to cure; (iv) any act or omission aiding or abetting a competitor, supplier or customer of the Company or any of its subsidiaries or affiliates to the material disadvantage or detriment of the Company or any of its subsidiaries or affiliates; (v) gross negligence, willful misconduct or a breach of fiduciary duty with respect to the Company or any of its subsidiaries or affiliates; (vi) violation of reasonable the [*sic*] Company policies in effect from time to time, including without limitation any policies prohibiting unlawful sexual or other harassment, which violation, if capable of being cured, is not cured within thirty (30) days of such failures and the action required to cure; or (vii) violation of the Restrictive Covenant Agreement, any future amendments or modifications thereto, or any other applicable agreement, policy, law or regulation governing the use and treatment of the Company's confidential information or trade secrets." (Exhibit 1, ¶7.d.)

34.     Section 4.c. of the Employment Agreement explains the Profits Interest component of Plaintiff Green's agreed upon compensations:

> <u>Profits Interest</u>: In connection with the execution of this Agreement, and assuming Executive's compliance with the terms and conditions set forth in this Agreement, and Executive's employment not being terminated for Cause, the Company will arrange for Executive to be granted a non-voting profit interest in the Company consistent with the terms and subject to the conditions precedent set forth in Exhibit B hereto.

(Exhibit 1, ¶4.c.)

35.     Exhibit B of the Employment Agreement provides, in part:

> ***Company Profits Interest.*** Provided that this Agreement has not been terminated prior to the Trigger Date (as defined below), the Company shall grant Executive a non-voting profits interest in the Company (the "Profits Interest") equal to one and one half percent (1.5%) of the Company]'s fully-diluted capitalization as of immediately following the consummation or abandonment of the Reorganization (as defined below), with such grant

> to be made on or about the Trigger Date. The Profits Interest shall (a) vest in monthly increments over the three (3) year period, with the vesting commencement date being May 1, 2021, (b) have a threshold value equal to the fair market value of such interest as of the date of grant, as reasonably determined by the Board of Directors of the Company (the "Board") and (c) be subject to "double-trigger" acceleration upon a change of control of the Company, all as to be further set forth in a grant agreement underlying the issuance of the Profits Interest (the "Grant Agreement") and an amended and restated operating agreement of the Company (the "A&R Operating Agreement").

(Exhibit 1, Ex. B).

36.     The second and final paragraph of Exhibit B of the Employment Agreement applies in the event that the Trigger Date did not occur within six months of the Effective Date of the Employment Agreement. It provides:

> Should the Profits Interest fail to be granted by the six (6)-month anniversary of the Effective Date, the Company agrees to consider in good faith alternative arrangements to supplement Executive's compensation package.

(Exhibit 1, Ex. B).

37.     Pursuant to this second paragraph of Exhibit B of the Employment Agreement, AdImpact was required to undertake certain tasks "in good faith" to vest Mr. Green's Profits Interest or a commensurate alternate arrangement within six (6) months of the Effective Date, that is, by October 20, 2021. (Exhibit 1, Ex. B).

38.     Plaintiff Green considered the Company Profits Interest as the key employment incentive and a material term of the Employment Agreement. Notably, the Company Profits Interest amount in the Employment Agreement is almost double the Profit Interest amount in the Consulting Agreement.

11

39.     Section 7 of the Employment Agreement confirmed that employment could be terminated by the Company at any time "for Cause or without Cause, by Executive, or as a result of Executive's death or disability." (Exhibit 1, ¶7).

40.     Section 7.a. of the Employment Agreement provides that AdImpact is not obligated to pay any compensation after Mr. Green leaves his employment if one of two conditions occur, that is, either (a) "the Company terminates Executive's employment for Cause" or (b) "Executive voluntarily terminates Executive's own employment without Good Reason." (Exhibit 1, ¶7).

41.     On the other hand, Section 7.b. of the Employment Agreement provides that if Mr. Green is terminated by AdImpact without Cause or if he terminated his own employment for Good Reason, then Mr. Green would be entitled to two months of Base Salary and healthcare benefits following the termination date as "Severance Pay" in exchange for execution of a general release of claims in a form provided by and "satisfactory to" AdImpact executed by Mr. Green. (Exhibit 1, ¶7).

**Plaintiff Green's Contributions to AdImpact**

42.     When he entered into the Employment Agreement, AdImpact was fully aware that Mr. Green would need to scale back his consulting business in order to dedicate his full-time efforts to AdImpact and accept full-time employment with AdImpact.

43.     In fact, following April 20, 2021, Mr. Green significantly scaled back his consulting business and clients, which he had developed over more than a decade as his primary form of income, in order to accept this offer of employment and become an employee of AdImpact.

12

44.     Mr. Green performed his duties as an employee in good faith, using his highly specialized and extensive expertise in furtherance of improving the profitability and market value of AdImpact.

45.     Mr. Green worked diligently to improve the profitability of AdImpact and he was highly motivated to do so by the Profits Interest and Commission parts of his compensation under the Employment Agreement, in order to compensate for the scaling back of his consulting business.

46.     During this time, Mr. Green helped to drive numerous deals that closed during his tenure and within the first twelve months after his termination without Cause.

47.     Mr. Green relied on AdImpact's good faith compliance under the Employment Agreement for satisfaction of the Company Profits Interest and Commission to compensate Mr. Green, as these served as a significant part of his compensation package.

**AdImpact Terminates Mr. Green's Employment Without Cause**

48.     Despite his successful job performance, on May 27, 2022, Mr. Green received an email with correspondence regarding a "Separation Letter" from Mr. Roberts, AdImpact's CEO (the "Separation Letter"), notifying Mr. Green that he was terminated effective the same day and providing two (2) months of Base Salary and healthcare coverage in exchange for execution of the attached Separation Agreement and Release. (Exhibit 3).

49.     At that time, Mr. Green had served as an exempt, full-time employee in the position of Chief Business Officer of AdImpact for more than one year and one month.

50.     The Separation Letter was the only correspondence that Mr. Green received from AdImpact informing him of his termination. It contains no reference to being terminated for Cause and contains no statement of any criticism of Mr. Green or his performance. Moreover, the closing paragraph of Separation Letter cordially states "[w]e sincerely appreciate your contributions to and service with AdImpact, and wish you the best of luck with your future endeavors." (Exhibit 3).

51.     In the Separation Letter, AdImpact also offered Mr. Green two (2) months of Base Salary and healthcare coverage, which is consistent with a termination without Cause by AdImpact pursuant to the provisions of Section 7.b. of the Employment Agreement.  If AdImpact had terminated Mr. Green for Cause pursuant to Section 7.a., then AdImpact was not required to offer Mr. Green additional Base Salary or benefits beyond the date of termination.

52.     Mr. Green never received any notification at any time from AdImpact that he was being terminated for Cause, nor did he offer or provide his resignation.

53.     As Mr. Green was neither terminated for Cause nor resigned his employment, he expected AdImpact to comply with the terms of the Employment Agreement in good faith, including honoring its obligations to provide him with Commissions and Profits Interest owed to him, and provide him with the information to calculate such post-termination compensation.

### Post-Termination Communications

54.     Following his termination, Mr. Green, through prior counsel, sought clarification from AdImpact regarding when he could expect payment of the Commissions and Profits Interest owed to him under the Employment Agreement.

55.     The Commissions and Profits Interest payments owed to Mr. Green are part of his total compensation package, and are not contingent upon achievement of any goals or metrics or performance criteria.

56.     Mr. Green's eligibility and entitlement to receive his compensation package, including but not limited to the Profits Interest and Commission, was triggered by his execution of the Agreement.

57.     Under the terms of the Agreement, AdImpact cannot avoid payment of the post-termination compensation, including but not limited to the Profits Interest or Commission, for any reason other than Mr. Green's termination for Cause.

58.     Despite this, AdImpact advised that Mr. Green would not be receiving any further payments from AdImpact.

59.     At the time the Agreement was entered into, the Parties agreed and understood that the Profits Interest and Commission compensation due to Mr. Green pursuant to the Employment Agreement was an essential part of the terms and conditions of his acceptance of full-time employment with AdImpact.

60.     Mr. Green would not have accepted AdImpact's offer of employment in the Employment Agreement without the continuation of the eligibility for the Profits Interest or a commensurate alternate arrangement.

61.    In violation of the terms of the Employment Agreement, AdImpact failed to take action in good faith to compensate Mr. Green for the Profits Interest or establish a commensurate alternate arrangement by October 20, 2021.

62.    Mr. Roberts, AdImpact's CEO, continuously reassured Mr. Green through April 2022 that he would be putting an alternate equivalent to the Profits Interest in place for Mr. Green as contemplated by the Employment Agreement.

63.    However, no Profits Interest or commensurate alternate equivalent to the Profits Interest was ever created or provided to Mr. Green as required by the Employment Agreement.

64.    Similarly, AdImpact neither paid Mr. Green any post-termination Commission owed to him nor provided him with a Commission Statement therefor.

65.     Contrary to the covenants contained in Exhibit A of the Employment Agreement, requiring the issuance of Commission Statements by AdImpact to Mr. Green, AdImpact has refused to provide Mr. Green with any information necessary to calculate the value of his Commissions which were required to be paid to Mr. Green under the Employment Agreement after his termination without Cause.

66.    AdImpact also has refused to provide Mr. Green with any information on his Profits Interest in AdImpact or commensurate alternate equivalent of his Profits Interest in AdImpact.

67.    Mr. Green has suffered economic and non-economic damages as a direct and proximate cause of AdImpact's actions.

68.     To the extent that AdImpact continues to deny Mr. Green the compensation he is owed after his termination without cause, AdImpact will continue to demonstrate its bad faith and to be unjustly enriched by Mr. Green's more than eighteen (18) months of service, specifically, thirteen (13) months of full-time employment, particularly as Mr. Green was a part-time consultant to AdImpact providing virtually the same services with a substantially and materially similar compensation structure for an additional five (5) months prior to his employment.

69.     AdImpact gained the benefits of Mr. Green's expertise and services over eighteen (18) months to grow AdImpact's enterprise value without compensating Mr. Green with the Profits Interest and Commission which had been contemplated contractually since the inception of Mr. Green's involvement with AdImpact initially through the Consulting Agreement and later through the Employment Agreement.

## <u>COUNT I</u>
## (BREACH OF CONTRACT)

70.     Plaintiff repeats and realleges Paragraphs 1 through 68 as set forth above, as if fully set forth herein.

71.     The Employment Agreement was in effect at the time of Mr. Green's termination without Cause.

72.     Paragraph 4 of the Employment Agreement identifies the Base Salary, Commission and Profits Interest as essential components of Mr. Green's compensation package.

73.     The Employment Agreement provides that AdImpact must have vested Mr. Green's Profits Interest no later than October 2021 or provided a commensurate alternate equivalent to the Profits Interest.

74.     AdImpact has failed to exercise good faith in its contractual obligations under the Employment Agreement, including failure to vest Mr. Green's Profits Interest, to complete the tasks necessary to vest this Profits Interest or to provide a commensurate alternate equivalent to this Profits Interest to supplement Mr. Green's compensation package under the Employment Agreement.

75.     AdImpact has further failed to pay Mr. Green post-termination Commissions pursuant to Section 4 and Exhibit A of the Employment Agreement and to send Mr. Green any post-termination Commission Statements pursuant to Section 4 and Exhibit A of the Employment Agreement.

76.     As such, with the failure to honor and pay elements of the compensation owed to Mr. Green after his termination without Cause pursuant to the Employment Agreement, AdImpact has materially breached the Employment Agreement.

77.     Mr. Green has suffered economic and non-economic damages as a direct and proximate result of AdImpact's wrongful actions.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor against the Defendant, Advertising Analytics, LLC d/b/a AdImpact, in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000), plus pre-judgment and post-judgment interest, and such other and further relief that this Court deems just and equitable under the circumstances.

## <u>COUNT II</u>
## (BREACH OF COVENANT OF GOOD FAITH AND FAIR DEALING)

78.     Plaintiff repeats and realleges Paragraphs 1 through 76 as set forth above, as if fully set forth herein.

79.     AdImpact has acted in bad faith and has breached the covenant of good faith and fair dealing with regard to its contractual obligations for Mr. Green's compensation under the Employment Agreement.

80.     Following the six-month anniversary of the Effective Date of the Employment Agreement, AdImpact failed and refused to consider in good faith alternative arrangements to supplement Plaintiff's compensation package commensurate with the promised Profits Interest of 1.5% non-voting profits interest in in the Company.

81.     Mr. Green has suffered severe economic and non-economic damages as a direct and proximate result of AdImpact's intentional, bad faith and unreasonable behavior.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor against the Defendant, Advertising Analytics, LLC d/b/a AdImpact, in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000), plus pre-judgment and post-judgment interest, and such other and further relief that this Court deems just and equitable under the circumstances.

## COUNT III
**(WAGE CLAIMS VIOLATION OF VIRGINIA WAGE PAYMENT ACT)**
**(VA Code § 40.1-29.)**

82.     Plaintiff repeats and realleges Paragraphs 1 through 80 above, as if fully set forth herein.

83.     Plaintiff was terminated without cause by AdImpact on May 27, 2022.

84.     Since that time, and despite repeated requests therefor, AdImpact has failed to honor  or pay compensation earned by and owed to Mr. Green as a result of work performed for AdImpact prior to his termination.

85.     Specifically, AdImpact has knowingly failed and refused to pay Plaintiff an essential and substantial portion of his wages due and owing to him, as provided for by the applicable Employment Agreement, notably Profits Interest and Commissions.

86.     AdImpact's failure to pay is in violation of the Virginia Wage Payment Act as it constitutes knowingly withholding of part of Plaintiff's wages or salaries without written or signed authorization.

87.     Plaintiff has suffered economic and non-economic damages as a direct and proximate result of AdImpact's intentional, willful, knowing, and bad faith actions.

WHEREFORE, Plaintiff respectfully requests that judgment be entered in his favor against the Defendant, Advertising Analytics, LLC d/b/a AdImpact, in an amount to be determined at trial, but in no event less than Seventy-Five Thousand Dollars ($75,000), constituting unpaid wages, liquidated damages, plus pre-judgment and post-judgment interest, reasonable attorney's fees and costs, and treble damages, and such other and further relief that this Court deems just and equitable under the circumstances.

Respectfully submitted,

By:   */s/ Richard W. Evans*
Richard W. Evans, (VSB # 89748)
McCARTHY WILSON LLP
2200 Research Boulevard, Suite 500
Rockville, Maryland 20850
301-762-7770 - Office
301-926-7444 - Facsimile
evansr@mcwilson.com
*Counsel for Plaintiff*

Dated: November 4, 2024